UNITED STATES BANKRUPTCY COURT

WESTERN DISTRICT OF WISCONSIN

---

In re:                                                                                 Case Number: 04-16465-7

    SCOTT DUANE WYSS
    and JOY ANN WYSS,

                   Debtors.

---

    BREMER BANK, N.A.,

                   Plaintiff,

v.                                                                   Adversary Number: 04-276

    JOY ANN WYSS and
    SCOTT DUANE WYSS,

                   Defendants.

---

MEMORANDUM OPINION, FINDINGS OF FACT,
AND
<u>CONCLUSIONS OF LAW</u>

The Court conducted the trial in this adversary proceeding on August 9, 2006. The plaintiff was represented at trial by Jeffrey W. Guettinger, while the defendants were represented by Erwin H. Steiner. At trial, the plaintiff stipulated to the dismissal of its claims under 11 U.S.C. § 727(a). After the close of the plaintiff's case, the defendants moved for judgment on partial findings pursuant to Fed. R. Bankr. P. 7052 and Fed. R. Civ. P. 52. The Court took the motion under advisement pending the presentation of the defendant's case in chief, and subsequently granted the motion as the defendants' case concluded. Based upon

the record, the Court determined that the obligation at issue is dischargeable under 11 U.S.C. §§ 523(a)(2)(A), (a)(4) and (a)(6).  The plaintiff did not demonstrate that the debtors obtained an extension of credit based upon any fraudulent representations or actual fraud.  Likewise, the plaintiff did not demonstrate that the debtors embezzled funds, acted in a fiduciary capacity, or willfully and maliciously converted the creditor's collateral to their own purposes.

As to the first issue, under 11 U.S.C. § 523(a)(2)(A), the debtors may not discharge debts for money obtained through false representations, false pretenses, or actual fraud.  Of importance in the context of this case, the code denies the dischargeability of debts for money, property, services, or an extension, renewal, or refinancing of credit *to the extent obtained by* the debtors' fraudulent conduct.  This section requires that the plaintiff prove several elements by the preponderance of the evidence.  First, the creditor must demonstrate that the debtor obtained money through representations which were either known to be false or which were made with reckless disregard for their veracity.  Second, the creditor must prove that the debtor possessed scienter, or the "intent to deceive," when the representations were made.  Third, the creditor must prove that it relied upon the representations, and that its reliance was justified under the circumstances.  See Field v. Mans, 516 U.S. 59, 116 S. Ct. 437, 133 L. Ed. 2d 351 (1995); In re Maurice, 21 F.3d 767 (7th Cir. 1994); In re Scarlata, 979 F.2d 521 (7th Cir. 1992).  Essentially, to succeed under this section, the creditor must combine three ingredients – falsity, fraudulent intent, and reliance.  Chevy Chase Bank, FSB

v. Briese (In re Briese), 196 B.R. 440 (Bankr. W.D. Wis. 1996).[1]  The plaintiff in this case did not meet its burden of proof as to any of these elements.

The facts are as follows.  The debtors, Scott and Joy Ann Wyss, operated two trucking operations: Fast Lane Transport, L.L.C., and J.C. Logistics, L.L.C.  In March 2003, the plaintiff loaned Fast Lane the sum of $200,000.00.  On August 15, 2003, the plaintiff loaned J.C. Logistics the sum of $50,000.00.  While nominally characterized as lines of credit, both loans actually refinanced earlier loans made to the companies.  Neither company made any draws against the lines of credit after the loans were established; instead, they simply maintained the outstanding debt on each account.  Both companies pledged their accounts receivable as collateral for the loans, and each company was required to submit a monthly "borrowing base certificate" reflecting the amount of outstanding receivables.  In 2004, the debtors submitted several certificates which indicated that the companies' combined receivables exceeded $500,000.00.  Based upon the terms of the credit arrangement, this meant that the companies did not need to make principal payments on the outstanding debts.

---

[1] As the Seventh Circuit has stated, the "actual fraud" component of § 523(a)(2)(A) may encompass more than overtly false representations and includes "all surprise, trick, cunning, dissembling, and any other unfair way by which another is cheated." McClellan v. Cantrell, 217 F.3d 890, 893 (7th Cir. 2000).  The bankruptcy code countenances a discharge for the proverbial "honest but unfortunate debtor." Grogan v. Garner, 498 U.S. 279, 287, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991).  Those who scheme to obtain money from others through fraudulent means cannot so easily escape those they have cheated; the bankruptcy code is not an "engine for fraud." McClellan, 217 F.3d at 893.  And yet the exceptions to discharge must be narrowly construed in favor of the code's policy of affording debtors a fresh start in life; this means that creditors are obligated to demonstrate that they were truly enmeshed in the debtor's fraudulent scheme, and that the debtor actually extracted money from them by way of fraud.

The plaintiff contends that the certificates submitted in 2004 were fraudulent. In support of this contention, the plaintiff offered reconstructions of the companies' records which indicated the existence of only a fraction of the receivables described in the certificates. The borrowing base certificates cited by the plaintiff as examples of the debtors' fraudulent conduct relate to a six-month period beginning in January 2004 and ending in June of that year. For example, the January 2004 borrowing base certificate for Fast Lane Transport indicated "qualified" accounts receivable of $352,780.01, while the plaintiff's reconstruction of the company's records reflected only $30,382.48 of receivables on the same date. Essentially, the bank's argument at trial can be summed up in this fashion: the debtors "obtained" money through the fraudulent submission of borrowing base certificates in the first six months of 2004. The question the Court must answer is whether the bank has proven its case.

The first challenge is whether the debtor obtained funds from the plaintiff through the use of a "false representation" or actual fraud. At trial, the plaintiff contended that the debtors had misrepresented the amount of their outstanding accounts receivable, which constituted the plaintiff's collateral. The debtors were obligated to provide the plaintiff with the monthly borrowing base certificates which purported to reflect the total outstanding receivables; pursuant to the loan documents, the debtors were entitled to borrow a certain percentage of their receivables and were only required to make principal payments if the loan-to-receivables ratio slipped below a certain level. According to the plaintiff, the

submission of these allegedly falsified certificates constituted a false representation which permitted the debtor to "obtain" an extension of credit.

The plaintiff's evidence of discrepancies in accounting relate to borrowing base certificates submitted to the bank in 2004, months after the 2003 refinancing of the debt.  In their motion for summary judgment and again in their motion for judgment on partial findings, the debtors stressed the lack of any evidence that misrepresentations were made when the debt was refinanced in 2003.  In general, the inquiry under § 523(a)(2)(A) focuses on the manner in which the debtor "obtained" the funds.  See McClellan, 217 F.3d at 895 (the statute requires that "money, property, or services be obtained by fraud").  Subsequent conduct is normally only relevant to the extent it can illuminate the debtor's behavior at the time the debt was incurred, and it is difficult to find that the 2004 borrowing base certificates somehow prove that the debtors perpetrated a fraudulent scheme upon the bank in 2003.  In response, the bank has argued that each monthly submission of a "borrowing base certificate" constituted a refinancing of the original debt.

At trial, the bank's representative testified that the loan was designed to provide operating capital for the debtors' businesses, and that the bank had financed the accounts receivable.  According to the bank's representative, the bank financed the accounts receivable because the companies experienced delays in processing their accounts and needed funds to pay ongoing business expenses.  However, the evidence at trial presented a markedly different picture: the debtors' 2003 refinancing essentially "rolled over" their companies' existing debts, on which they made little more than interest payments for much of the operative life of the

loans. Far from serving as a factoring arrangement, in which the debtors would use the line of credit to pay monthly operating expenses and then repay the bank as accounts were collected, the debtors did not pay down the debt and did not draw against the line of credit after the 2003 refinancing. Indeed, as reflected on the borrowing base certificates, the outstanding balance remained largely unchanged from month to month.

Admittedly, the refinancing or renewal of a debt may be excepted from discharge under § 523(a)(2)(A) even though the creditor did not extend "new money" to the debtor at the time of the refinancing. See In re Marx, 138 B.R. 633 (Bankr. M.D. Fla. 1992); In re Duncan, 123 B.R. 383 (Bankr. C.D. Cal. 1991). However, the creditor must prove that the debtor made false representations at the time of the refinancing, and the plaintiff in the present case did not do so, at least as concerns the 2003 refinancing. Despite the plaintiff's contentions to the contrary, the borrowing base certificates cannot justifiably be regarded as a monthly refinancing or extension of the debt; at best, they must be considered a monthly collateral report made to the bank by the debtors. Under the facts of this case, the debtors maintained an outstanding balance with the bank and provided monthly collateral reports; the bank was not truly providing ongoing financing based upon the accounts receivable. Instead, the debtors apparently used their accounts receivable, not the line of credit, to pay ongoing business expenses.

Presupposing that the plaintiff demonstrated that the debtors misrepresented the information found in the 2004 borrowing base certificates, the plaintiff did not offer any evidence that the debtors "obtained" funds from the bank

6

through fraud. The bank did not show that it parted with any "money, property, or services" as a result of these monthly reports. At best, it contends that it was delayed in making a demand for payment, which is akin to claiming that the debtors obtained an extension of credit through an "involuntary forbearance." There is a measure of disagreement about how broadly courts ought to construe the phrase "extension of credit" in this context. A number of courts have concluded that the use of falsified records to obtain an "involuntary forbearance" does not constitute the extension of credit under § 523(a)(2)(A).

For example, in the case of Greentree Fin. Servs. v. Howard (In re Howard), 261 B.R. 513 (Bankr. M.D. Fla 2001), the debtor falsified records regarding inventory sales. The court noted that merely postponing the need to account to a floor-plan financier for sales did not constitute an extension of credit within the meaning of this section; the term was simply not "broad enough" to include such involuntary forbearances. Id. at 518-19; see also Cmty. First Bank v. Rigg (In re Rigg), 310 B.R. 725 (Bankr. W.D. Ark. 2004) (deferral of collection efforts was not an extension, renewal, or refinancing of credit); Bombardier Capital v. Baietti (In re Baietti), 189 B.R. 549 (Bankr. D. Me. 1995) (concealment of breaches of a floor plan arrangement did not constitute "obtaining property or credit"); In re Schmidt, 70 B.R. 634 (Bankr. N.D. Ind. 1986) (forbearance does not constitute extension of credit); In re Bacher, 47 B.R. 825 (Bankr. E.D. Pa. 1985) (forbearing collection efforts does not constitute an extension of credit). In Baietti, the court rejected the argument that concealment or delayed reporting of a "contract breach" could give

rise to a non-dischargeable obligation for an "involuntary" extension of credit, saying that such an interpretation of § 523(a)(2)(A) "goes too far." 189 B.R. at 557.

Other courts have indicated that a creditor who is deceived into forbearing collection efforts may in fact be protected by § 523(a)(2)(A). See Bednarsz v. Brzakala (In re Brzakala), 305 B.R. 705 (Bankr. N.D. Ill. 2004). In In re Gerlach, 897 F.2d 1048, 1050 (10th Cir. 1990), the court characterized an extension of credit as "an indulgence by a creditor giving his debtor further time to pay an existing debt." In In re Eaton, 41 B.R. 800, 802-03 (Bankr. E.D. Wis. 1984), the court noted that an "extension" of credit is "generally understood to include such things as lengthening, stretching and spreading" the loan period. In Field v. Mans, 157 F.3d 35 (1st Cir. 1998), the Court of Appeals considered the issue in the context of a Supreme Court remand. The creditors contended that they were induced not to accelerate a mortgage based upon the debtor's misrepresentations, thus extending credit "involuntarily." The court noted that an extension may be an "increase in length of time" or "an agreement on or concession of additional time (as for meeting an overdue debt or fulfilling a legal formality)." Id. at 43. The court stated:

> While the concealed sale was not technically a new "agreement" concerning the existing credit, it triggered legal rights under the existing credit agreement which markedly altered the credit relationship between the parties. We, therefore, agree with the Fields that, by deceiving them into continuing a credit arrangement they now had the right to terminate, the fraud related to what can properly be called "an extension of credit." As the Fields would or could have called the note had they known the truth, Mans's fraud tended to perpetuate–hence "extend"–credit that otherwise the Fields would or could have stopped.

Certainly such an interpretation makes sense in the context of a situation like Eaton, in which the debtor allegedly made misrepresentations to the creditor after the loan was in default, or where the creditors suffered a discernible harm, as in Field.  Indeed, as the Ninth Circuit noted in Locke v. United States Trustee (In re Locke), 205 B.R. 592 (B.A.P. 9th Cir. 1996), a creditor in this context must demonstrate that it had valuable collection remedies at the time of the misrepresentation, that it did not exercise those remedies based upon the misrepresentation, and that those remedies lost value during the extension period. Id. at 598.  Where a creditor knowingly forfeits a remedy based upon a falsehood, it may be justifiable to characterize it as an "extension" of credit, but the phrase also seems to contemplate the idea that the creditor affirmatively opts to delay collection efforts.  Here, the creditor did not knowingly decide to forbear collection efforts in connection with a defaulted loan, and so it is important to consider the totality of the circumstances surrounding what the debtors purportedly "obtained" from the creditor.

In McClellan, the Seventh Circuit sketched the broad outline of § 523(a)(2)(A) as prohibiting the discharge of debts in which the debtor obtained something of value through fraud.  As the court noted in that case, the statute is designed to prevent a debtor from benefitting from fraudulent conduct and then seeking a discharge in bankruptcy.  So the question must be asked: presupposing the veracity of the plaintiff's evidence, and assuming the debtors falsified the 2004 borrowing base certificates, what item of value did they obtain from the creditor? What remedy did the bank surrender, and were its collection efforts impacted by

the fraud? If there were only $30,382.48 of accounts receivable in January of 2004 instead of $352,780.01, what did the bank part with, or lose, as a result of the fraud? The answer, quite simply, is nothing.

The bank did not give the debtors more money. The purported "forbearance" did not lead to losses that could otherwise have been avoided because the bank's collateral did not exist. The bank did not knowingly surrender collection rights in reliance upon a false representation or a fraudulent scheme; it took no action based upon the certificates themselves. Based upon the bank's own evidence, its collateral position did not significantly deteriorate from January to June; instead, its collateral position simply wasn't very good to begin with.[2] Under the facts of this case, the "involuntary forbearance" the debtors may have obtained simply does not rise to the level of an extension of credit, and the bank did not part with "money, property or services" as a proximate result of the debtors' alleged falsehoods.[3] If, as the Seventh Circuit indicates, the question is whether the debtor

---

[2] According to the plaintiff, the January borrowing base certificate for Fast Lane listed $352,780.01 in accounts receivable, when the bank believes there were only $30,382.48. In June, the borrowing base certificate represented $487,140.88 in receivables, while the bank's record reconstruction indicates there were $48,149.88 in receivables. The bank did not prove that it possessed valuable collection remedies which lost value as a result of the purported fraud.

[3] Similarly, the plaintiff did not prove, by a preponderance of the evidence, that the borrowing base certificates were in fact falsified. For example, the plaintiff could have introduced evidence that the alleged accounts did not exist; instead, the evidence only demonstrated that the accounts did not appear in the company records the plaintiff could find. There was also no evidence that the debtors acted with fraudulent intent. Finally, and in keeping with the reality that there was no "extension of credit" based on the 2004 borrowing base certificates, the plaintiff did not prove that it took any action whatsoever in reliance upon those certificates.

obtained something as a result of a fraudulent scheme, the Court must answer in the negative.[4]

The plaintiff also argues that the debt is non-dischargeable under § 523(a)(4), which prohibits the discharge of debts incurred for "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." The first part of this exception requires the presence of a "fiduciary capacity," which has uniformly been characterized as some sort of statutory, technical, or express trust relationship between the parties. See Meyer v. Rigdon, 36 F.3d 1375 (7th Cir. 1994); Harsch v. Eisenberg (In re Eisenberg), 189 B.R. 725 (Bankr. E.D. Wis. 1995). The plaintiff has not identified such a relationship, and the evidence did not reflect that the debtors owed a fiduciary responsibility to the creditor. To succeed under a claim of larceny or embezzlement, the creditor must demonstrate that the debtor exercised inappropriate control over funds belonging to the creditor but which were entrusted to the debtor. In re Heath, 114 B.R. 310 (Bankr. N.D. Ga. 1990). Embezzlement requires evidence that property was rightfully in the possession of a non-owner and that the non-owner thereafter misappropriated that property in a fraudulent manner. In re Littleton, 942 F.2d 551 (9th Cir. 1991). There has been no such evidence; the accounts receivable, for example, belonged to the debtors' business entities, not the creditor.

---

[4] In its flurry of post-trial activity, the plaintiff has requested that the Court conform the pleadings to the evidence and permit it to advance a claim for non-dischargeability under 11 U.S.C. § 523(a)(2)(B), which involves the fraudulent use of a financial statement. Even were it appropriate to grant this request, the claim would fail for the same reasons outlined here: the plaintiff did not prove that the debtors "obtained" something through fraud, did not prove fraudulent intent, and did not prove that it either took action as a result of the purported fraud or relied upon the fraud to its detriment.

11

Case 1-04-00276-tsu   Doc 68   Filed 09/27/06   Entered 09/27/06 15:29:59   Desc Main
                              Document      Page 12 of 14

Finally, the plaintiff argues that the debt should not be discharged under 11 U.S.C. § 523(a)(6), which prohibits the discharge of debts "for willful and malicious injury by the debtor to another entity or to the property of another entity." While conversion of collateral is actionable under this section, the creditor must still demonstrate that the debtor's conduct was "willful and malicious." This generally means that the creditor has proven that the debtor acted intentionally and with a knowledge that harm would result from the actions. "Willful" has been interpreted to mean a deliberate or intentional act. In re Cullen, 71 B.R. 274 (Bankr. W.D. Wis. 1987). For an act to be "malicious," the debtor must have known that his act would harm another and proceed in the face of that knowledge. Id. at 282.

At the close of the plaintiff's case, it had not proven these essential elements of this claim. While it demonstrated the existence of discrepancies between the borrowing base certificates and the computer records of the debtors' companies, the plaintiff did not prove that the debtors submitted the certificates to the bank knowing that to do so would cause the bank harm. Further, the plaintiff did not demonstrate that the debtors actually converted any collateral at all; indeed, much of the plaintiff's case was based upon the argument that the debtors simply lied about the amount of accounts receivable they actually possessed.[5] To succeed under § 523(a)(6), the plaintiff needed to demonstrate the existence of collateral

---

[5] At the conclusion of the trial, the Court noted that the plaintiff could have contacted the companies the debtors claimed owed them money in order to verify the apparent discrepancies, either as proof of the debtors' misrepresentations or as evidence that the debtors otherwise dissipated the bank's collateral. No such evidence was offered.

12

which was in fact fraudulently misappropriated by the debtors. The plaintiff's evidence suggested at best that the debtors had failed to generate the level of accounts receivable that both parties undoubtedly desired, not that the debtors pocketed the proceeds of any accounts which actually existed. Accordingly, the claim for conversion cannot succeed.

Based upon the record, the Court finds it appropriate to grant the defendants' motion for judgment on partial pleadings and award judgment determining that the plaintiff's claims under § 523(a) may be discharged. Pursuant to the plaintiff's stipulation, its claims under § 727(a) may also be dismissed. After the conclusion of the trial in this case but before an order was actually entered, the plaintiff filed a motion to continue the trial or, in the alternative, for a new trial. Part of the plaintiff's argument is that it was not afforded the opportunity to present rebuttal testimony or closing argument. However, as indicated above, the Court's intent was to grant the motion for judgment on partial pleadings given the fact that the plaintiff had not demonstrated a prima facie case to support its claims. Further, to the extent that the plaintiff has offered additional affidavit testimony or other evidence to bolster its claims, all of this evidence was available and could have been presented in its case in chief at trial. None of it constitutes "newly discovered evidence" which would justify granting a new trial under Fed. R. Bankr. P. 7052, Fed. R. Civ. P. 52(b), or Fed. R. Civ. P. 59.[6] From the outset of this case, the

---

[6] For example, in the plaintiff's motion to conform the pleadings to the evidence, it makes an "offer of proof" that a comparison of the borrowing base certificates provided to the bank at the time of the 2003 refinancing with the companies' computer records

(continued...)

defendants have contended that the 2004 borrowing base certificates do not justify a finding that they "obtained" money, property, services, or an extension of credit from the plaintiff. The plaintiff did not produce sufficient evidence to support its claims at trial, and consequently judgment is appropriate in favor of the defendants.

Accordingly, the debt is discharged and the case is dismissed. The defendants' request for sanctions is denied. The parties shall bear their own costs.

This decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

Dated: September 27, 2006

BY THE COURT:

/s/ Thomas S. Utschig

---
Hon. Thomas S. Utschig
U.S. Bankruptcy Judge

---

[6](...continued)
indicates additional discrepancies. The plaintiff's accounting expert, Dale Wood, testified at the trial and yet never mentioned this contention. These computer records were in the plaintiff's possession for months prior to the trial and could have been produced during its case in chief. They were not. This is not newly discovered evidence; it is an attempt to recast the case once the trial has ended.

14